# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

Civil Action No. _____

IN THE MATTER OF THE TAX LIABILITIES OF:

JOHN DOES, United States taxpayers who,
during the years ended December 31, 1999
through December 31, 2004, had signature
authority over bank accounts at or over
MasterCard, VISA, or American Express
cards issued by, through, or on behalf of
banks or other financial institutions in
Anguilla, Antigua and Barbuda, Aruba,
Bahamas, Barbados, Belize, Bermuda, British
Virgin Islands, Cayman Islands, Cook
Islands, Costa Rica, Cyprus, Dominica,
Gibraltar, Grenada, Guernsey/Sark/Alderney,
Hong Kong, Isle of Man, Jersey, Latvia,
Lichtenstein, Luxembourg, Malta, Nauru,
Netherlands Antilles, Panama, Samoa,
St. Kitts and Nevis, St. Lucia, St. Vincent
and the Grenadines, Singapore, Switzerland,
Turks and Caicos, and Vanuatu

---

## DECLARATION OF BARBARA KALLENBERG

---

Declaration of Barbara Kallenberg

- 1 -

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................. - 3 -
I.  REASONABLE BASIS FOR BELIEF OF THE 'JOHN DOE' CLASS'S
    FAILURE TO COMPLY WITH INTERNAL REVENUE LAWS...................... - 6 -
    A.  The Use of Offshore Tax Haven and Financial Privacy Jurisdictions........... - 6 -
        1.  The Gordon Report ............................................................................. - 6 -
        2.  The Caribbean Basin Report ................................................................ - 8 -
        3.  The Crime and Secrecy Report ............................................................ - 8 -
        4.  The United Nations Report ................................................................. - 10 -
    B.  The Use of Bank Accounts and Payment Cards in Offshore Schemes ........ - 11 -
        1.  General practice ................................................................................. - 11 -
        2.  Interviews and Conversations ............................................................. - 13 -
        3.  Brochures ........................................................................................... - 15 -
        4.  Internet Sites ...................................................................................... - 17 -
        5.  Actual court cases .............................................................................. - 26 -
        6.  Publications ........................................................................................ - 33 -
II. THE SUMMONS TO PAYPAL SEEKS TO IDENTIFY PERSONS IN THE
    'JOHN DOE' CLASS NOT YET IDENTIFIED ................................................ - 37 -
    A.  Other 'John Doe' Summonses ................................................................... - 37 -
        1.  "John Doe" Summonses to American Express and MasterCard ......... - 38 -
        2.  "John Doe" Summons to VISA International ...................................... - 38 -
        3.  Second "John Doe" Summons to MasterCard .................................... - 39 -
        4.  "John Doe" Summonses to Merchants ............................................... - 39 -
        5.  "John Doe" Summonses to Third Party Processors ........................... - 40 -
    B.  PAYPAL ..................................................................................................... - 42 -
        1.  Nature of the Business ....................................................................... - 43 -
        2.  Information to identify persons in class............................................. - 46 -
        3.  The Identified Countries .................................................................... - 48 -
CONCLUSION .................................................................................................. - 49 -

Declaration of Barbara Kallenberg

1373440.1

## INTRODUCTION

I, Barbara Kallenberg, pursuant to 28 U.S.C. Section 1746, declare and state:

I am a Revenue Agent/Offshore Compliance Technical Advisor with the Small Business/Self Employed Division of the Internal Revenue Service currently assigned to the Offshore Credit Card Project. I have been a Revenue Agent for almost 15 years. As a Revenue Agent, I have received training in tax law and audit techniques, including specialized training in International Tax Issues, Abusive Tax Promotions (Offshore), Foreign Trusts and Offshore Entities, and Offshore Credit Card Project examination techniques. I have conducted income tax examinations of a number of taxpayers who employed credit cards issued by offshore banks and have assisted other agents in numerous similar examinations. I am currently assigned as technical advisor to the Offshore Credit Card Project.

The Internal Revenue Service is conducting an investigation to determine the correct federal tax liabilities, for the years ended December 31, 1999, through December 31, 2004, of United States taxpayers who have signature authority over bank accounts at or over American Express, MasterCard, or VISA credit, debit or charge cards, (collectively referred to as payment cards) issued by, through, or for banks or other financial institutions in Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados

Belize, Bermuda, British Virgin Islands, Cayman Islands, Cook Islands, Costa Rica, Cyprus, Dominica, Gibraltar, Grenada, Guernsey/Sark/Alderney, Hong Kong, Isle of Man, Jersey, Latvia, Liechtenstein, Luxembourg, Malta, Nauru, Netherlands Antilles, Panama, Samoa, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Singapore, Switzerland, Turks and Caicos, and Vanuatu.

To facilitate this investigation, the Internal Revenue Service, once authorized by the court, will issue under the authority of Section 7602 of the Internal Revenue Code (26 U.S.C.), a "John Doe" summons to PayPal, Inc. ("PAYPAL"). A copy of this summons is attached to the Exhibits Appendix, submitted contemporaneously with this Declaration, at Tab 1.

PAYPAL is a global payments platform that acts as a financial intermediary in Internet payments transactions, enabling its customers to send and receive Internet payments securely, conveniently, and cost effectively. The records sought by the summons will reveal the identities of and/or disclose transactions by persons who may be liable for federal taxes and will enable the Internal Revenue Service to investigate whether those persons have complied with the internal revenue laws.

Based upon my experience and information received from other investigations, it is likely that a number of the persons who have signature authority over bank accounts at or over American Express, MasterCard, or VISA payment cards issued by, through, or

for banks or other financial institutions in the jurisdictions identified in the "John Doe" summons may have been under-reporting income, evading income taxes, or otherwise violating the internal revenue laws of the United States.

The "John Doe" summons to PAYPAL relates to the investigation of an ascertainable group or class of persons. There is a reasonable basis for believing that this group or class of persons has failed or may have failed to comply with provisions of the internal revenue laws. The information and documents sought to be obtained by the summons are not already in the possession of the Internal Revenue Service and are not readily available from sources other than PAYPAL.

Section I of the declaration details the basis for the belief that the "John Doe" class has failed, or may have failed, to comply with the internal revenue laws. Section II details the history of the IRS's investigation of the class and how the information summoned from PAYPAL may assist in that investigation.

Declaration of Barbara Kallenberg

1373440.1

# I. REASONABLE BASIS FOR BELIEF OF THE 'JOHN DOE' CLASS'S FAILURE TO COMPLY WITH INTERNAL REVENUE LAWS.

The Internal Revenue Service has been concerned with the growing problem of United States taxpayers, involved in both lawful and unlawful activities, evading the payment of United States taxes by concealing unreported taxable income or claiming improper deductions as a result of maintaining diverted funds in accounts in offshore tax haven and financial privacy jurisdictions. One means of accessing those funds is through the use of payment cards (including credit, charge or debit cards) issued to the taxpayer.

## A. The Use of Offshore Tax Haven and Financial Privacy Jurisdictions

The United States Congress, the United States Treasury Department, a Presidential Commission, the Internal Revenue Service and numerous journalists have examined and reported on the use of offshore tax haven and financial privacy jurisdictions to evade the payment of United States taxes.

### 1. The Gordon Report

On January 12, 1981, the Internal Revenue Service issued a report entitled "Tax Havens and Their Use by United States Taxpayers - An Overview," commonly known as the "Gordon Report" for its author, Richard A. Gordon, Special Counsel for International Taxation. The Gordon Report was based on a review of judicial decisions and published literature in the field of international tax planning, research into internal IRS documents concerning taxpayer activities, interviews with IRS personnel, personnel who dealt with

1 tax haven issues for other federal government agencies, and lawyers and certified public

2 accountants who specialized in international taxation. Additionally, the findings in the

3 Gordon report were based on a statistical analysis of available data concerning

4 international banking, United States direct investment abroad and foreign investment in

5 the United States.

6 The Gordon Report states that the available data and interviews with practitioners,

7 IRS personnel, personnel from other agencies and representatives of foreign

8 governments support the view that taxpayers ranging from large multi-national

9 companies to individuals and criminals are making extensive use of tax havens. It

10 describes tax haven countries as having at least some of the following characteristics: (1)

11 low rates of tax when compared with the United States; (2) a high level of bank or

12 commercial secrecy that the country refuses to breach even under an international

13 agreement; (3) relative importance of banking and similar financial activities to its

14 economy; (4) the availability of modern communication facilities; (5) lack of currency

15 controls on foreign deposits of foreign currency; and (6) self-promotion as an offshore

16 financial center. The Gordon report concluded that there are:

17

18 enormous and growing levels of financial activity and accumulation of
19 funds in tax havens [as well as a] large number of transactions involving
    illegally earned income and legally earned income which is diverted to or
20 passed through havens for purposes of tax evasion.

21 The Gordon Report also found that the "term 'tax haven' may also be defined by a

22

23

'smell' or reputation test: a country is a tax haven if it looks like one and if it is considered one by those who care. Many publications identify jurisdictions as tax havens, and the same jurisdictions generally appear on all of the lists." The tax havens studied in the Gordon Report include the Bahamas, Bermuda, Cayman Islands, the Channel Islands, Hong Kong, Isle of Man, Luxembourg, Netherlands Antilles, Panama, Singapore, Switzerland, and Turks and Caicos.

### 2. The Caribbean Basin Report

On January 6, 1984, the United States Department of the Treasury published an update of the Gordon Report entitled "Tax Havens in the Caribbean Basin." Of the twenty-eight countries in the Caribbean Basin, the report focuses on the Bahamas, Bermuda, Cayman Islands, Netherlands Antilles, and Panama. It includes a discussion of tax haven transactions designed to escape taxation through fraudulent means including so-called "double-trust" schemes and the use of tax haven corporations to hide beneficial ownership. The Caribbean Basin Report concludes with the following language:

> It is difficult to measure the illegal use of tax havens because of the nature of the transactions and because of the difficulty of obtaining information from most tax havens. Nevertheless, it seems reasonable to assume that a great deal of activities designed to violate the tax and other laws of the United States takes place in the Caribbean Basin tax havens.

### 3. The Crime and Secrecy Report

On August 28, 1985, the Permanent Subcommittee on Investigations of the

Declaration of Barbara Kallenberg

1373440.1

United States Governmental Affairs Committee issued a report entitled "Crime and Secrecy: The Use of Offshore Banks and Companies." The Crime and Secrecy Report summarized the offshore problem as follows:

> The subcommittee found that the criminal exploitation of offshore havens is flourishing because of haven secrecy and foreign government intransigence in the face of overwhelming evidence of dirty money in their banking systems. The effect has been to systematically obstruct U.S. law enforcement investigations, erode the public's confidence in our criminal justice system, and thwart the collection of massive amounts of tax revenues.

The report includes a quote from Senator William V. Roth, Chairman of the subcommittee regarding the committee's findings on the use of tax havens by American citizens:

> But equally shocking is the fact that we have also found that offshore havens are no longer used exclusively by criminals. Instead, they are increasingly being used by otherwise law abiding Americans to avoid paying taxes and to shield assets from creditors.

The Crime and Secrecy Report estimated that the "underground economy" at that time was hiding between $150 billion and $600 billion apparently unreported income from both legal and illegal business from the Internal Revenue Service. Furthermore, it stated that the underground economy was unquestionably linked to the use of offshore facilities.

The Crime and Secrecy Report includes an extensive discussion of "principal havens," including Anguilla, Antigua, Bahamas, Bermuda, Cayman Islands, Hong Kong,

Liechtenstein, Luxembourg, Nauru, Netherlands Antilles, Panama, St. Vincent and the

Grenadines, Singapore, Switzerland, Turks and Caicos Islands, and Vanuatu.

4.     The United Nations Report

On May 29, 1998, the United Nations' Office for Drug Control and Crime

Prevention, Global Programme Against Money Laundering, released a report entitled

"Financial Havens, Banking Secrecy and Money Laundering."  The United Nations

Report (at http://www.cf.ac.uk/socsi/whoswho/levi-laundering.pdf) states that offshore

financial centers, tax havens and bank secrecy jurisdictions --

> attract funds partly because they promise both anonymity and the
> possibility of tax avoidance or evasion. A high level of bank secrecy is
> almost invariably used as a selling point by offshore financial centers.
> Many Internet advertisements for banks emphasize the strictness of the
> jurisdiction's secrecy and assure the prospective customers that neither the
> bank nor the government will ever give bank data to another government.
> When the advertising is for private banks, it also stresses the protection
> from tax collectors.

United Nations Report, pg. 36.

Among the "major financial havens" described in this report are the following

jurisdictions: Anguilla, Antigua, Aruba, Bahamas, Barbados Belize, Bermuda, British

Virgin Islands, Cayman Islands, Cook Islands, Costa Rica, Cyprus, Gibraltar, Guernsey,

Hong Kong, Isle of Man, Jersey, Liechtenstein, Luxembourg, Malta, Nauru, Netherlands

Antilles, Panama, Samoa, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines,

Singapore, Switzerland, Turks and Caicos Islands, and Vanuatu.  United Nations Report,

Declaration of Barbara Kallenberg

- 10 -

1373440.1

pgs. 48 - 49.

## B.    The Use of Bank Accounts and Payment Cards in Offshore Schemes

The use of bank accounts and payment cards in offshore schemes seems to follow a general pattern. That general pattern is described in part 1 below. The remaining parts provide evidence and information corroborating that pattern.

### 1.    General pattern

Based upon a compliance initiative information gathering project on offshore transactions, the Internal Revenue Service has found that accounts at offshore banks are often used as repositories of funds concealed from taxing authorities and has found the use of payment cards (including credit, charge and debit cards), as a means of obtaining access to offshore funds, to be a common practice promoted by offshore professionals and used by persons with offshore accounts. The information gathering project, and the Service's experience with examinations in the Offshore Credit Card Project, reveal that the following generally occurs.

First, the United States taxpayer will find an offshore professional to assist in developing an overall offshore plan. This will often include creating an entity or entities in a financial secrecy jurisdiction. For example, the offshore professional will help create an International Business Corporation ("IBC") in the Bahamas. The IBC will have nominee owners, usually employees of a Bahamian law firm. The nominee owners will

execute some type of agreement or declaration stating that they hold the shares of the IBC for the United States taxpayer, who then is referred to as the beneficial owner of the IBC. Under the secrecy law of some foreign countries, there can be no disclosure of the United States taxpayer"s beneficial ownership of the IBC, and there will be no mention of the United States taxpayer"s ownership interest in any of the corporate documents or corporate filings.

Once the offshore structure is created, the next step is to devise methods to transfer funds or assets to the IBC. These funds or assets are often held, in whole or in part, in accounts at offshore banks. The funds or assets may represent profits the United States taxpayer seeks to hide from the federal tax authorities.

The last step in the process employs techniques to access funds when desired, either by repatriation or by use abroad. Payment cards are a common and purportedly a non-traceable method of accessing offshore funds in any location where the card is honored. The card account may be in the name of the United States taxpayer or in the name of the beneficially owned foreign entity. Offshore cards are typically secured by funds equaling anywhere from 100% to 200% of the credit extended. The funds are locked into an account at the bank offering the card. Arrangements can be made for discreet billing and discreet card payments such that all such transactions occur away from the scrutiny of federal investigators.

Declaration of Barbara Kallenberg

- 12 -

1373440.1

The United Nations Report, discussing the use of cards as a repatriation device, states that:

> Funds can be repatriated through a debit or credit card issued by an offshore bank. Withdrawals from ATM machines or expenditures using the card can be settled either by automatic deduction from a foreign bank account or by the card-holder periodically transferring the required funds from one foreign bank account to another. Debit cards are superior from the point of view of automaticity and confidentiality. However, even an ordinary credit card can be turned into a debit card by being secured through the deposit of collateral with the issuing bank. Although secured credit cards were initially intended to give persons who were deemed a bad credit risk the advantages of use of a credit card, something that is increasingly essential for many purposes such as reserving hotel rooms or renting cars, it can be very useful to anyone seeking to lower their financial profile.

United Nations Report, pg. 19. The Report also states:

> Credit and debit cards are the way people who have laundered money draw ready cash without leaving a financial trail. As one advertisement for a bank put it, it is the best way to stay in touch with "your offshore account."

United Nations Report, pg. 97.

2.     Interviews and Conversations

Interview with a Cayman Island Banker - The IRS has interviewed John Mathewson, the former president and majority owner of Guardian Bank, located in the Cayman Islands. Since his arrest in 1996 and subsequent guilty plea to bank fraud, tax evasion and money laundering charges, Mr. Mathewson has cooperated with the United States in the investigation of individuals who had used Guardian Bank to evade U.S.

taxes. Mr. Mathewson told the IRS that 95 percent of the over 1000 depositors at the bank were U.S. citizens. He indicated that he promoted the creation of an offshore entity to "own" the U.S. person's assets. Mr. Mathewson stated that he recommended numerous techniques to covertly move money from the U.S. to the Cayman Islands. These methods included wire transfer, money orders, check payments to correspondent accounts or dummy corporate accounts, diverting taxable receipts and false invoicing. Mr. Mathewson advised that he promoted the use of credit/debit cards so that his clients could covertly access funds stored in the Cayman Islands. He stated that these techniques were promoted and used to evade U.S. taxation. Mr. Mathewson showed the IRS a credit card with the name of Guardian Bank embossed on the front, which he used for his personal purposes.

Interview with Employee of an Offshore Promoter - This person is a confidential informant. The person told the IRS that the promoter for whom he worked targeted U.S. taxpayers to engage in offshore transactions. He further stated that the clients were advised to access their offshore funds via debit/credit cards. This promoter was found guilty November 2003 of conspiring to defraud the Internal Revenue Service, in violation of Title 18, USC, Section 371, two counts of evading excise taxes for 1993 in violation of Title 26, USC, Section 7201, conspiracy to launder money, in violation of Title 18, USC, Section 1956(H), and twelve counts of money laundering, in violation of

Title 18, USC, Sections 1956(a)(1)(B)(I) and 1957. The promoter's tax evasion scheme involved establishing and utilizing domestic and foreign shell corporations and bank accounts. The jury heard evidence that he laundered more than $8 million in proceeds generated from an illegal Freon smuggling scheme by using a series of wire transfers through Panamanian corporations and bank accounts.

3.     Brochures

IRS agents attended two offshore conferences and expositions held in London, England, on December 2 – 4, 1997 and March 29 – 30, 2000. The conferences, called Shorex 97 and Shorex 2000, were marketed as "the Premier Offshore Conference." Exhibitors and presenters of information included numerous banks, offshore promoters, accountants, trustees, lawyers, software companies, tax haven government officials, and other well known businesses interested in profiting from the offshore market. During their attendance at Shorex 97 and Shorex 2000, the IRS agents had the opportunity to obtain literature and promotional materials regarding offshore products. The following are excerpts from two:

➢Swiss American Banking Group Offshore Banking and Trust Management Services (Antigua) pamphlet:

> Swiss American Bank Ltd is a Principal Member of VISA International
> and MasterCard International. We promote a Secured Credit Card
> Programme, which allows private and corporate customers to set their own
> credit limits by maintaining an interest bearing deposit equivalent to 150%

Declaration of Barbara Kallenberg

- 15 -

1373440.1

of the required credit line. It is a US dollar international credit card, honored by every major airline, car rental companies, fine hotels, restaurants and stores around the world. Furthermore, customers can use the VISA or MasterCard to obtain instant cash advances at most financial institutions worldwide through a global network of automatic teller machines. Charges are billed monthly and customers will typically maintain a separate current or savings account for which they will fax instructions to be debited to pay card charges. With our Swiss Americard programme, customers can enjoy unparalleled flexibility and confidentiality in accessing funds internationally, with discrete payment procedures.

➤ABI Financial Group (Antigua) brochure:

Clients of AOB/ABIB may obtain a VISA Credit Card or MasterCard that gives them worldwide access to their accounts while preserving total confidentiality.

4. <u>Internet Sites</u>

I have reviewed various offshore/tax haven related Web sites on the Internet. A search of the Internet with any search engine using the key words "offshore" or "tax haven" will produce a very large number of hits. The Internet is becoming an increasingly popular method of obtaining information about any subject matter. As an information and marketing tool, the Internet is being used to market a wide variety of offshore related services. An individual can form an offshore corporation, create an offshore bank account, request offshore credit and/or debit cards, receive advice regarding offshore schemes, attend offshore presentations and do a variety of other offshore related tasks all via the Internet. Offshore services are being offered by a wide variety of individuals and entities. The marketers range from scam artists pushing offshore techniques as means to steal money from the public to major financial institutions. All are promoting the use of some offshore vehicle, either offshore trusts, foreign bank accounts or offshore corporations that are touted as being completely legal and are effective in reducing tax.

The following is a sampling of Web sites representative of the financial services being marketed:

> Finor Associates Ltd. (Finor Organization)
http://www.finor.com

This former website for an "internationally diversified group" initially based in

Panama and later based in Costa Rica (the website refered to Costa Rica as "The

Switzerland of Latin America having strict banking and legal secrecy laws") provides

"like-minded individuals and companies the best in offshore advice, products, and useful

privacy related services for highly confidential business." The tax considerations behind

these services were clearly expressed:

> At this time, both direct and indirect taxes are accounted of, the
> Governments of most industrialized nations collect well in excess of 50%
> of all we earn, yet persistently say that taxes are lower than ever: believe
> that and you'll believe anything!
>
> That's why we have a situation where virtually everyone who is either self
> employed, owns and runs a business or has family money, needs to move
> offshore to protect both assets and income. In one way our philosophy is
> very simple - to pay the least tax ourselves and to help others do the same!
> It's not that we're against all taxes *per se*, but there are limits to what we'll
> take!

This website offered offshore banking with "NO Reporting Requirements, NO

Taxation, International ATM Debit/Secured Credit Card Availability." Among the cards

offered were MasterCard Business, Silver, and Gold credit cards and VISA debit cards.

Bank accounts with credit/debit cards were offered in the following jurisdictions (among

others):

> Anguilla
> Antigua
> Bahamas
> Belize
> British Virgin Islands
> Cayman Islands

Cyprus
Dominica
Gibraltar
Guernsey
Hong Kong
Jersey
Latvia
Luxembourg
Malta
Panama
Singapore
Switzerland
Turks & Caicos

(Copies of these Web pages are attached to Exhibits Appendix at Tab 2).

>   Barclays in The Caribbean
>   http://www.caribbean.barclays.com/offshore.html

   FirstCaribbean International Bank
   http://www.firstcaribbeanbank.com/international/index.html

Barclays, a large international bank offered offshore "international banking services from 5 centres in the Caribbean." The homepage displayed a map that highlighted the proximity of these Caribbean offshore banking centres to Miami, Florida, and thus their easy access by U.S. persons. From the homepage there was a link to a page setting forth the "Key Benefits of Banking with Barclays in the Turks & Caicos Islands." The benefits described include: "The jurisdiction is responsive to the needs of international investors, with a tax-free status and no double tax nor exchange of fiscal treaties with other countries." The links to the benefits of banking in the Bahamas and

the British Virgin Islands also highlighted their "tax-free status" and the "lack of

exchange controls for non-residents." Available from Barclays was the Gold VISA

Barclaycard with availability of cash advances of up to US$5,000 through a worldwide

ATM network. These cards, if lost or stolen, "can be replaced within one working day

(in the U.S.)." Barclays and Canadian Imperial Bank of Commerce merged their

Caribbean operations in 2002 and formed FirstCaribbean International Bank.

FirstCaribbean offers a Gold Visa Card which "must be secured and provides a

convenient means of access to funds held offshore." (Copies of these Web pages are

attached to Exhibits Appendix at Tab 3).

> Royal Bank of Canada Global Private Banking
  http://www.rbcprivatebanking.com

This is the homepage for "one of the world's leading banks" dedicated to helping

individuals with significant assets in "preserving and enhancing [their] wealth in an

international environment." The "International Banking" web page has a link to a page

that details the "Executive Plus" account, "for people who . . . need easy access to their

money." The Executive Plus account "also includes the convenience of – A Royal Bank

of Canada *Visa*™ Gold Debit Card." (Copies of these Web pages are attached to

Exhibits Appendix at Tab 4).

> Butterfield Bank
  http://www.bankofbutterfield.bm/web2000/home.asp

This bank, with branches in the Bahamas, Barbados, Bermuda, the Cayman Island, and Guernsey, offers international private banking. Its web site states "Butterfield Bank international private banking may be for you if: You require the premium, efficient, confidential service offered by a private bank". "Butterfielddirect" is their Internet banking service that provides "**Convenience:** Access your chequing, savings, loan, moneymarket, credit card and call accounts from the comfort of your home, office or anywhere you access the Internet. **Tools**: Transfer cash, pay bills, view balances, print reports, make wire payments, order bank products and more!" Butterfield Bank offers a debit card. The website states "With a Bank of Butterfield debit card you can access your accounts when and where it is convenient for you. A ButterfieldCard debit card enables you to: Access your accounts at local and international automatic teller machines (ATMs) 24 hours a day"… "Pay by direct debit at local and foreign merchants displaying either the Maestro or MasterCard logos". (Copies of these Web pages are attached to Exhibits Appendix at Tab 5).

> ➢ Taxhaven Co.
>    http://www.taxhavenco.com

This website provides various offshore services, such as anonymous banking, offshore bank accounts, anonymous Internet banking, offshore company formation, anonymous credit cards, anonymous debit cards, offshore merchant bank accounts and offshore trusts, in more than 30 offshore jurisdictions. It touts the anonymity and ease of

Declaration of Barbara Kallenberg

- 21 -

1373440.1

use of offshore credit and debit cards citing examples of their use such as:

> **"Final Example:** You are moving to (or already living in) a country full of grasping, corrupt public officials who can be relied upon to tax, confiscate, seize and freeze everything in sight.....You want to be able to access a few hundred dollars in cash spending money every few days in a low profile way.

> Get an Anonymous ATM Card and for the rest of your life you have access to cash anywhere in your home country or abroad - quite anonymously."

Another webpage contains the following information:

> "How does it work?

> The card only has your account number on it and no statements are ever sent to you. We don't need your identification or your social security number either. With our anonymous debit cards you have total privacy - your bank doesn't know how you spend your cash and now your card can be the same!

> Is it as simple as that?

> Yes! Our anonymous ATM cards can be used in over 6 million outlets around the world, anywhere you see the Meastro or Cirrus logo. What's more you can draw cash from any one of over 700,000 ATMs 24 hours a day 7 days a week with complete anonymity.....You can also use your card to make purchases at over 5.5 million retail locations around the world that display the Maestro logo."

> "With the Anonymous ATM Card, you can get CASH 24 HOURS A DAY, 7 DAYS A WEEK anonymously, anywhere in the world! Moreover, the Anonymous ATM Card is linked to the US dollar."

This website offers an International Business Company (IBC) package that can be incorporated in 24 hours. This package includes, among other things, an IBC, foreign

Declaration of Barbara Kallenberg

1373440.1

trust, VISA credit card and a debit card. (Copies of these Web pages are attached to Exhibits Appendix at Tab 6).

> ➢ AFM Services Group
> http://www.boncamper.com/

This website offers professional financial, management and corporate services including the formation of International Business Corporations and offshore trusts in St. Kitts and Nevis for "Asset Protection and Offshore Privacy." The "practical uses" of a St. Kitts and Nevis International Business Corporation allow someone to "own property for tax efficiency and preserve anonymity." AFM Services also provides services for obtaining secured VISA cards and offshore bank accounts. (Copies of these Web pages are attached to Exhibits Appendix at Tab 7).

> ➢ KPMG Corporate Services (Belize) Limited
> http://www.kpmgbelize.com/

The website for KPMG Corporate Services, as of March 11, 2004, set forth that it is an affiliate "of the extensive global KPMG network comprised of more than 100,000 KPMG professionals across 159 countries" and "will make setting up offshore an easy decision." Its staff can assist in offshore company formation and administration, facilitating the opening of "US $ accounts" and "access to globally accepted credit cards." This website explains how easy it is to set up a Belize International Business Corporation (IBC) stating "Belize's legislation facilitates speedy and simple incorporation, and its modern and computerized IBC Registry is capable of incorporating

1    a company within one hour." This site also touts the asset protection features and

2    **"Security and Confidentiality"** of a Belize IBC. "With a Belize IBC...

3        • disclosure of the beneficial owner(s) is not required;

4        • share register may be inspected only by a shareholder;

5        • assets are protected from confiscation or expropriation orders or similar

6            actions by foreign governments."

7    (Copies of these Web pages are attached to Exhibits Appendix at Tab 8).

8        ➤    Maritime International Ltd.
9             http://www.milonline.com/index.html

10   Maritime International "offers tax free companies, corporations, LLCs and

11   offshore asset protection trusts" in a number of jurisdictions including Antigua,

12   Bahamas, Belize, Dominica, Nevis, Panama and St. Vincent. It also arranges for the

13   "opening of tax free offshore corporate banking and trading accounts" in the Caribbean,

14   South Pacific and Switzerland.  This website explains the distinction between onshore

15   and offshore banking: Onshore banking "is subject to the tax rules, foreign exchange and

16   charges of whatever country the account is in. . . . Offshore banking on the other hand is

17   tax free, there are no foreign exchange regulations attached to the account and all

18   account information is confidential."   Offshore "credit cards and/or debit cards are

19   available."

20   

21   Maritime International extensively promotes several jurisdictions as having the

22   

23

Declaration of Barbara Kallenberg

- 24 -

1373440.1

"best offshore legislation, asset protection and privacy available." All recommendations emphasize the tax and secrecy considerations of forming offshore entities. For example:

PANAMA:

Although Panama has fairly high rates of tax internally, its status as a tax haven depends upon the principle that income received by a Panamanian corporation from sources outside Panama is exempt from tax.

Panama has full confidentiality and privacy embedded in the law, with civil and criminal penalties for disclosure. There is no requirement for the disclosure of beneficial ownership to the Panama authorities and no requirement for audited reports or financial statements. There are no double taxation agreements and no tax exchange agreements with other countries.

(Copies of these Web pages are attached to Exhibits Appendix at Tab 9).

> Corporate and Trust Services Caribbean Limited
> http://www.caribcats.com

This website offers offshore financial services in Antigua, Nevis and Dominica. It highlights the "benefits of going offshore" as including:

**Tax avoidance** - considerable tax savings in onshore territory. Although there is in the United States the legal requirement to report holdings in offshore companies to the local tax authorities, no matter how restrictive these rules may be a greater tax savings may be achieved by the use of an offshore company rather than a company incorporated in one's country of residence (Emphasis in original).

This website promotes the benefits of Dominica as an "offshore haven" that offers "a twenty year tax exempt, confidential, treaty-free jurisdiction." Additionally, it answers the questions "Why go offshore?" and "Why use Nevis?"

by emphasizing financial privacy and tax considerations including that Nevis has

"No tax information treaties with the United States." This website touts the

benefits of establishing a personal service company in Dominica and states:

> These companies allow professionals to secure their income offshore as
> professional fees are paid directly into the offshore corporation, which
> company will in turn pay the professional some meagre sum for tax
> reporting purposes.

This website offers banking services including call accounts, current accounts, savings

accounts, certificates of deposits, and money market accounts "provided with respect to

internationally accepted credit card applications. Note that credit cards must be secured

by up to one and a half times the spending limit." (Copies of these Web pages are

attached to Exhibits Appendix at Tab 10).

> ➢ Global Bank of Commerce
> http://www.globalbank.ag/products/index.cfm

T his website offers VISA Gold and MasterCard Gold individual and corporate

cards through the Global Bank of Commerce, LTD in Antigua. The website states "you

may also set your own limit, by maintaining a deposit equivalent to 150% of the required

credit limit." In listing the benefits of these payment cards it notes "Obtain cash

advances at most financial institutions worldwide" and "Cash can be obtained through a

global network of automated teller machines (ATM's)." (Copies of these Web pages are

attached to Exhibits Appendix at Tab 11).

     5.    <u>Actual court cases</u>

Some investigations in connection with offshore tax evasion schemes have been completed and in some cases defendants have pled guilty to criminal charges. The defendants in the cases listed below have admitted to using payment cards issued in offshore tax haven countries as a means to repatriate unreported income.

➢ United States v. David L. Bamford, Case No. 98cr712 (D. N.J.)

David L. Bamford pled guilty to a one count Information charging him with attempting to evade or defeat taxes in violation of 26 U.S.C. § 7201. In a personal interview with Internal Revenue Service personnel, Mr. Bamford stated that he had funds which he had illegally diverted to Guardian Bank in the Cayman Islands. Mr. Bamford stated that he obtained a credit/debit card to access the funds and used that credit/debit card to purchase personal items. Mr. Bamford stated that he did not receive bills from the credit card company. Rather, upon issuance of the credit/debit card, funds were removed from his account and placed in a reserve account and the reserve account was tapped by Guardian to pay the credit card bills. According to the face of the statements, the bills were addressed to Mr. Bamford at Guardian Bank's post office box. Mr. Bamford stated that the credit/debit card was suggested to him by John Mathewson as a covert means of accessing Mr. Bamford's offshore funds and that Mr. Bamford used the credit/debit card to make purchases in and out of the United States.

➢ United States v. Vernon E. Barton, 99cr82 (D. Idaho)

The defendant in this case, Dr. Barton, is a medical doctor in Idaho who pled guilty to a charge of subscribing to a false tax return for the 1995 year in violation of 26 U.S.C. § 7206(1). In the Plea Agreement signed by Dr. Barton on April 21, 1999, a copy of which is attached to the Exhibits Appendix at Tab 12, he agreed that in 1994 he began diverting partnership profits to a series of trusts as part of a tax evasion scheme. The Plea Agreement (at pg. 5) states:

> These sums would be paid as "management fees" rather than taken by Dr. Barton as income. Income in 1995 was deposited in local bank accounts opened in order to transfer said income to bank accounts in the Turk and Caicos Islands which were controlled by Paul Harris. Mr. Harris would then disburse sums to Dr. Barton by transfers or deposits to bank accounts Dr. Carroll [Dr. Barton's medical practice partner] maintained in the Turks and Caicos Islands and/or in the Channel Islands. Dr. Carroll would then disburse sums to Dr. Barton by transfer or deposits to a bank account Dr. Barton controlled in the Channel Islands. **Dr. Barton would then access these funds with debit cards, which funds were used for ordinary living or "personal inurement."** (Emphasis added).

> ➤    United States v. Richard L. Kirk, Case No. 00cr72 (N.D. Okl.)
>      United States v. Samuel R. Kirk, Case No. 00cr73 (N.D. Okl.)
>      United States v. Robert Mark Kirk, Case No. 00cr75 (N.D. Okl.)

The three defendants pled guilty to charges under 26 U.S.C. § 7206(1). The charges included references to the use of credit cards issued by a bank in the Cayman Islands. In his Plea Agreement he signed on May 26, 2000, a copy of which is attached to the Exhibits Appendix at 13, Robert Mark Kirk admitted (at pg. 4) that he knowingly filed false tax returns

in which I falsely omitted a substantial portion of the income I received from Datalink Electronics Corporation (Datalink) during 1993. The omitted income was deposited by Datalink to a bank account in my name in Grand Cayman Island, British West Indies, and **repatriated to the United States through cash withdrawals/advances and personal expenses charged on a credit card issued in my name.** (Emphasis added).

>      United States v. Neil R. Brown et al., Case No. 00cr434 (E.D. Ca.)

On August 22, 2003, in Sacramento, CA, Neil R. Brown was sentenced to 70 months imprisonment followed by three years supervised release. In addition, Brown was ordered to pay $4,797,603 in restitution to the victims of his fraud crimes. In March 2003, Brown pled guilty to conspiracy to defraud the United States by impeding the IRS in the ascertainment, computation, assessment, and collection of federal income taxes; aiding, assisting, counseling, and procuring the filing of false tax returns; conspiracy to engage in mail and wire fraud; and mail and wire fraud.

Evidence presented in court, showed that from about July 1, 1993, through about November 15, 2000, Brown and his associates schemed to defraud the United States by marketing to clients a program which used foreign corporations and trusts as a mechanism to engage in financial transactions designed to conceal income and assets from the IRS, and to give the false appearance of legitimate business expenses. Under Brown's scheme, the clients formed foreign corporations and trusts in the Bahamas and clients were advised to transfer money and income to these foreign entities. The money was repatriated back to the clients without paying taxes on it through two primary means

of fictitious loans and through the use of credit cards.

A newspaper article described the steps through which the defendants led their clients:

> A taxpayer formed a trust with himself as the beneficiary and a Brown associate as trustee, then formed a corporation wholly owned by the trust, both in the Bahamas. The client retained control over the trustee's activities.

> Next, the corporation opened a bank account in St. Helier, on the Channel Island of Jersey off Great Britain. The client was the only signatory on the account, but there was no paperwork available to U.S. authorities linking the taxpayer to the corporation and its account.

> * * *

> The orthodontist would go to a "consulting seminar" in the Bahamas, where he would attend half-dozen 45-minute classes devoted to such subjects as "internal cost controls," "accounts receivable factoring," and "estate and inheritance management."

> The Bahamian corporation would bill the professional corporation $300,000 in consulting fees and the money would be deposited in the Jersey bank account. The fees would be deducted as a business expense at a rate of 34 percent, and the orthodontist's professional corporation would realize a reduction in taxes of $100,000.

> The $300,000 would then come back to the orthodontist either through a credit card issued on a foreign bank or as a bogus loan.

> The credit card bills would be paid by a Brown-controlled entity in Dublin, Ireland, which would be reimbursed with funds transferred from the Jersey bank account. There would be no paper trail to the orthodontist, who would be the actual user of the card.

See Denny Walsh, New Tax Scam Makes Use of Trust, Sacramento Bee, January 8,

Declaration of Barbara Kallenberg

- 30 -

1373440.1

1    2001. A copy of this article is attached Exhibits Appendix at Tab 14.

2        ➢    United States v. Terry Neal, Case No. CR 03-35-HA (USDC Or.)

3        On April 12, 2004, Terry Neal pled guilty to conspiracy to defraud the United

4    States (18 U.S.C. § 371). Terry Neal had promoted making use of offshore tax haven

5    jurisdictions in a book published in 1998. In THE OFFSHORE ADVANTAGE: PRIVACY,

6    ASSET PROTECTION, TAX SHELTERS, OFFSHORE BANKING & INVESTING (MasterMedia

7    Publishing Corp. 1998) (at pg. 156), he promotes the benefits of offshore credit cards:

             You get further protection with an offshore account because you are
9        entitled to a credit card issued on that bank. That means you can charge to
         your heart's content, anywhere you want, and the information stops at your
10       offshore bank. If you charge on a domestic domiciled bank however, the
         information could become part of a database that is sold to whoever is
11       willing to pay the price.

12       In the criminal case against him, the government prosecuted Terry Neal for

13   assisting Marty Martin and Joe McDonald to hide unreported income from the Internal

14   Revenue Service. In his Petition to Enter Pleas of Guilty (attached to the Exhibits

15   Appendix at Tab 14A, at 6-7) (a motion to withdraw the guilty plea is pending before the

16   district court), Terry Neal describes the use of payment cards in the scheme:

             In 1999, in the District of Oregon, I knowingly conspired with Marty
18       Martin and Joe McDonald to defraud the United States by impeding the Internal
         Revenue Service through deceitful means from ascertaining their true and correct
19       tax liability. Martin and McDonald told me that they had failed to report capital
         gains earned offshore in Charon Management, Ltd. I had NATDO form Meridian
20       Matrix Partners as a Nevis [West Indies] IBC [International Business Company].
21       McDonald and Martin transferred funds from Charon Management to Meridian

Matrix. I then caused Leadenhall Trust Bank in the Bahamas to issue Martin and McDonald offshore credit cards so that they could spend the unreported capital gains in the United States without declaring the income.

> United States v. Dale Brown, Case No. Cr. 04-81HA (USDC Or.)

On April 19, 2004, defendant Dale Brown pled guilty to willfully signing and filing a false income tax return for 1998. In his Petition to Enter a Plea of Guilty (attached to the Exhibits Appendix at Tab 14B, at 7-8), Dale Brown described how a payment card issued by an offshore bank was a part of his scheme to underreport his income.

> I am the owner of Target Direct Productions, Inc., an "S" Corporation incorporated in Nevada, through which I conduct business as an author, and other legitimate activities. I paid to have a shell corporation formed in Nevis, [West Indies]. My name was not associated with the Nevis corporation in any public record. Target Direct paid the Nevis [corporation] for fictitious services that were never provided. Target Direct would wire transfer funds to a bank account in a foreign country to pay the Nevis corporation for the fictitious services.
> . . .
> Promoters of the offshore scheme provided me with a MasterCard debit card issued by a Caribbean bank. The card had my name on [it], permitting me to use it in the United States to make purchases and cash withdrawals. The account at the issuing bank only had the name of Nevis American Trust Company, the business name of the promoters. Statements were sent to Nevis American Trust Company in Nevis. Monthly payments were made out of my funds held by Nevis American Trust in foreign bank accounts. In this fashion, I was able to spend funds for personal reasons which had been sent offshore to my Nevis corporation, which funds had been deducted from my corporate returns as business expenses.

> United States v. Herbert J. Greaves, Case No. Cr. 04-80274-1 (E.D. Mich.)
> United States v. Kurt P. Greaves, Case No. Cr. 04-80274-2 (E.D. Mich.)

On April 12, 2004, defendants Herbert J. Greaves and Kurt P. Greaves pled guilty

Declaration of Barbara Kallenberg

- 32 -

to willfully signing and filing false income tax returns for tax years 1999, 2000, and

2001. The Greaves were owners of Greaves, Inc., and operated various businesses,

including a roofing company.

In their Plea Agreements (attached to the Exhibits Appendix at Tabs 14C and 14D

at 2-3), Herbert and Kurt Greaves each described how he used a credit card issued by an

offshore bank as a part of his scheme to underreport his income:

> In one scheme, which involved tax years 1999 and 2000, defendant used
> shell corporations in Nevada to claim false business deductions on the books and
> tax returns of Greaves, Inc. Pursuant to the scheme, defendant caused Greaves,
> Inc. to issue corporate checks in the names of the Nevada shell corporations,
> which were then falsely deducted as "professional fees" and/or "outside fees."
> The checks were sent to Nevada and deposited in bank accounts controlled by the
> promoters. The promoters and their associates then wire transferred the funds
> offshore to corporate bank accounts in Nevis, West Indies that defendant
> controlled. With the assistance of the promoters and their associations, funds
> from these foreign accounts were used to obtain and pay for a credit card issued
> by Leadenhall Trust Compnay Ltd. in the Bahamas. Defendant used the credit
> card to pay personal expenses. As a result, defendant realized income that he
> failed to report on his individual income tax returns for 1999 and 2000.

      6.    Publications

The use of payment cards to access money that has been hidden offshore has been

so widespread as to have made its way into the published media.

➢     On November 14, 1999, the Washington Post published an article by

Sharon Walsh titled "A Case Study in the Elusiveness of Offshore Banks" in which the

activities of a Melvin J. Ford were highlighted. According to the article, a copy of which

is attached to the Exhibits Appendix at Tab 15, Mr. Ford and his associates were being investigated by the Internal Revenue Service, the Securities and Exchange Commission, the U.S. Attorney's office in Maryland, the U.S. Customs Service and U.S. postal inspectors. The article explains Mr. Ford's activities:

> In addition to insulating himself by depositing his investor's money in accounts in offshore jurisdictions that are difficult to trace, Ford also has protected himself by preaching the gospel of fear to his clients, according to investigators and former clients.

> Many of the investors he has lured to offshore seminars affiliated with The Forum have been part of militant anti-government groups and already have a natural distrust of government agencies. Ford has added to that concern by telling them the IRS would only want to take away their investment returns, so even those who have lost tens of thousands of dollars have not reported those losses to authorities.

One of the aspects of Mr. Ford's activities includes the use of offshore cards. The Washington Post writes:

> U.S. banks must keep records of all inbound and outbound wire transfers, although once the money is deposited in an offshore bank, the account names may be changed, making it impossible to trace it further. In addition, many offshore banks issue credit cards that can be used as debit cards. So if you wanted to buy a $50,000 car in the United States, you could simply use your Antigua bank's Visa card rather than writing a check or wiring the money back to the United States. This is how Melvin Ford paid his living expenses, according to investigators.

➤ Jerome Schneider wrote a book titled THE COMPLETE GUIDE TO OFFSHORE MONEY HAVENS: HOW TO MAKE MILLIONS, PROTECT YOUR PROPERTY, AND LEGALLY AVOID TAXES (Prima Publishing), and it has been updated and revised in several

editions.

Chapter 6 of the 3rd Edition, published in 1999, is titled "Say Goodbye to the IRS" and ends with the following paragraph: "Right now, offshore banks and some foreign companies let you legally move assets outside the United States and beyond the reach of Uncle Sam. While the special tax breaks they provide may not last forever, for the moment there are fortunes to be made abroad."

Chapter 6 of the 4th Edition, published in December 2001, is titled "Trying to Say Goodbye to the IRS." The last paragraph of this chapter now states: "Right now, offshore banks and some foreign companies let you legally move assets outside the United States and benefit from this move. All you have to do is reap your profits and pay your taxes. There are still fortunes to be made abroad."

Despite the attempt in the 4th Edition to remove statements explicitly advocating tax evasion, the book continues to recommend offshore havens, especially (at pg. 219): "Overall, I can tell you that my favorite offshore money havens are the British Virgin Islands and my three Ns: Nauru, Nevis, and the Netherlands Antilles. These four locations have ironclad secrecy rules and a reputation for making it difficult for U.S. authorities to access private information."

Jerome Schneider describes his use of an offshore payment card in the 3rd Edition at pages 85 and 86: "A U.S. nest egg is as vulnerable as a real egg, and that's not much

use to you if ever you should fall on hard times. Not so for the offshore nest egg. It remains safely and legally hidden from the prying eye of the government, or anyone else that wants to get their hands on your capital." Mr. Schneider then describes "two emergency tools in my wallet": one is a plastic key to his car, "The other is a credit card which I've had set up so it's connected to my offshore nest egg. If ever I should find myself in need, I can use this card to quickly tap in to my emergency capital. I think of it as my 'get out of trouble free' card–just like in the board game Monopoly."

Notably, Mr. Schneider and Los Angeles lawyer Eric Witmeyer were charged with 23 counts of tax fraud, wire fraud and mail fraud in a grand jury indictment unsealed December 19, 2002, relating to their alleged roles in a broad conspiracy to defraud the IRS. Mr. Witmeyer pled guilty to a single count on January 17, 2003, and agreed to co-operate in the case against Mr. Schneider. On February 11, 2004, Mr. Schneider agreed to plead guilty to one count of conspiring to defraud the U.S. government, namely the IRS, and has pledged full cooperation with authorities.

➢ In THE OFFSHORE MONEY BOOK: HOW TO MOVE ASSETS OFFSHORE FOR PRIVACY, PROTECTION, AND TAX ADVANTAGE (Contemporary Books 2000), Arnold L. Cornez, J.D., writes:

> If you truly crave privacy, avoid using your onshore credit cards. They provide an ongoing permanent electronic diary of where you go, what you buy, how much you spend, where you shop, whom you telephone, what telephone companies you use, where you entertain and vacation,

which travel agents and airlines you use, and on and on. Charge your discreet expenses offshore!

## II. THE SUMMONS TO PAYPAL SEEKS TO IDENTIFY PERSONS IN THE 'JOHN DOE' CLASS NOT YET IDENTIFIED.

The "John Doe" summons for which the IRS seeks authorization to serve in this case is a summons to PAYPAL, a financial intermediary in Internet payments transactions. The IRS has already issued several "John Doe" summonses to credit card companies, and through those summonses obtained payment card numbers. In many cases, however, the credit card companies were unable to identify the card holder because the credit card companies do not issue cards directly, but only process transactions for member banks licensed to issue the payment cards. PAYPAL, as a financial intermediary dealing directly with persons using payment cards and bank accounts, has information necessary to identify the card holders of accounts at and payment cards issued by banks located in offshore financial secrecy jurisdictions.

This section of the declaration is divided into two parts. The first describes past efforts made by the IRS to identify the "John Doe" class at issue in this suit. The second part explains in detail how a summons to PAYPAL could assist the IRS in this effort.

### A. Other 'John Doe' Summonses

The IRS has requested, and each court has granted, authorization to issue "John Doe" summonses to other financial service companies and businesses as part of the

Declaration of Barbara Kallenberg

1373440.1

IRS's effort to identify those persons with payment cards issued by banks in offshore tax haven or financial privacy jurisdictions.

### 1. "John Doe" Summonses to American Express and MasterCard

On October 30, 2000, the Southern District of Florida in Case No. 00-3919 CIV-JORDAN issued an order approving the service of "John Doe" summonses upon American Express and MasterCard International, Inc. ("MasterCard"). Copies of the Court's Order and of the "John Doe" summonses are attached to the Exhibits Attachment at Tabs 16 and 17, respectively.

These summonses sought information regarding holders of American Express and MasterCard payment cards issued by or through banks or other financial institutions in Antigua and Barbuda, the Bahamas and the Cayman Islands.

### 2. "John Doe" Summons to VISA International

Based on the results of the continuing analysis of information obtained from MasterCard, the Internal Revenue Service expanded the scope of the investigation. The time period was expanded to include the determination of the correct federal tax liabilities, for the years ended December 31, 1999, 2000 and 2001, and the jurisdictions in which the cards were issued were expanded to include tax haven and financial privacy jurisdictions throughout the Caribbean, European and Asian/Pacific markets.

On March 27, 2002, the Northern District of California in Case No. 02-MC-49,

the court on March 27, 2002 issued an order approving the service of a "John Doe"

summons upon VISA International. Copies of the Court's Order and of the "John Doe"

summons are attached to the Exhibits Appendix at Tabs 18 and 19, respectively.

### 3. Second "John Doe" Summons to MasterCard

On August 20, 2002, the Southern District of Florida in Case No. 02-22404-CIV-

UNGARO-BENAGES issued an order approving the service of a second "John Doe"

summons upon MasterCard International. This second summons reflected a larger time

period and increased number of offshore jurisdictions than the investigation had

encompassed at the time of the first "John Doe" summons. Copies of the Court's Order

and of the "John Doe" summons are attached to the Exhibits Appendix at Tabs 20 and

21, respectively.

### 4. "John Doe" Summonses to Merchants

The Internal Revenue Service determined that some merchants could identify

persons who used a particular card to purchase products or services from them. In an

effort to identify the owner of some of the MasterCard payment cards for whom the

cardholders remained unidentified, the Internal Revenue Service sought permission to

serve "John Doe" summonses on particular merchants.

In 26 petitions, the Internal Revenue Service requested permission to serve "John

Doe" summonses on 141 merchants. The information sought from the merchants

included names and addresses associated with the transactional data previously produced by the credit card companies.

Each request was granted. The table below lists the case numbers in which orders authorizing the Internal Revenue Service to serve the "John Doe" summons were issued:

| Date of Petition | Jurisdiction | Case Number |
|---|---|---|
| August 2002 | USDC N.D. Cal. | 02-CV-04147 |
| August 2002 | USDC N.D. Ga. | 02-MI-254 |
| August 2002 | USDC N.D. Ill. | 02-CV-6178 |
| August 2002 | USDC N.J. | 02-4211 |
| August 2002 | USDC N.D. Tex. | 02-CV-1854L |
| August 2002 | USDC E.D. Va. | 02-MC-42 |
| August 2002 | USDC W.D. Wa. | C-02-1848 |
| October 2002 | USDC Ariz. | MC-02-0066 |
| October 2002 | USDC C.D. Cal. | 02-7965 |
| October 2002 | USDC M.D. Fla. | 02-mc-100 |
| October 2002 | USDC S.D. Fla. | 02-23032 |
| October 2002 | USDC Md. | 02-CV-3357 |
| October 2002 | USDC Minn. | 02-MC-49 |
| October 2002 | USDC E.D. Mo. | 02-MC-283 |
| October 2002 | USDC S.D. NY | M-18-304 |
| October 2002 | USDC S.D. Ohio | C-1-02-738 |
| October 2002 | USDC W.D. Tex. | A02-CA-667 |
| October 2002 | USDC W.D. Va. | 02-MC-00002 |
| October 2003 | USDC S.D. Tex. | H-03-4054 |
| October 2003 | USDC N.D. Ok. | 03-MC-28 |
| October 2003 | USDC Colo. | 03-DV-1968 |
| October 2003 | USDC W.D. Tenn. | 03-MC-26 |
| October 2003 | USDC E.D. Pa. | 03-cv-05665 |
| October 2003 | USDC Mass. | 03-MC-1031 |
| October 2003 | USDC E.D. Va. | 03-cv-142 |
| December 2003 | USDC W.D. Mi. | 03MC0140 |

5.      "John Doe" Summonses to Third Party Processors

In a further effort to identify the United States taxpayers holding offshore payment cards for which transactional data was obtained from the card associations and merchants, the Internal Revenue Service turned its attention to U.S. based third party processors of card transactions, who sometimes maintain records on a contract basis for card issuing banks, including offshore banks.

On September 11, 2003, the United States District Court for the Southern District of Florida in Case No. 03-22177 CIV-MARTINEZ, issued an order approving the service of a "John Doe" summons upon Credomatic of Florida, Inc., a third party processor for a number of banks in tax haven or financial privacy jurisdictions. Copies of the Court's Order and of the "John Doe" summons are attached to the Exhibits Appendix at Tabs 22 and 23, respectively. The court subsequently entered an order approving service of a modified "John Doe" summons on Credomatic of Florida, Inc., on April 2, 2004. Copies of the Court's second Order and of the modified "John Doe" summons are attached to the Exhibits Appendix at Tabs 24 and 25, respectively.

On August 2, 2004, the United States District Court for the District of Colorado in Case No. 04-F-1548 (OES), issued an order approving the service of a "John Doe" summons upon First Data Corporation, a third party processor for a number of banks in tax haven or financial privacy jurisdictions. Copies of the Court's Order and of the "John Doe" summons are attached to the Exhibits Appendix at Tabs 24 and 25, respectively.

Declaration of Barbara Kallenberg

1373440.1

On August 5, 2004, the United States District Court for the Southern District of Florida in Case No. 04-21986 CIV-UNGARO-BENAGES, issued an order approving the service of a "John Doe" summons upon TecniCard, Inc., a third party processor for banks in tax haven or financial privacy jurisdictions. Copies of the Court's Order and of the "John Doe" summons are attached to the Exhibits Appendix at Tabs 26 and 27, respectively.

On August 15, 2004, the United States District Court for the Middle District of Georgia in Case No. 4:04CV94-1(CDL), issued an order approving the service of a "John Doe" summons upon Total Systems Services, Inc., a third party processor for a number of banks in tax haven or financial privacy jurisdictions. Copies of the Court's Order and of the "John Doe" summons are attached to the Exhibits Appendix at Tabs 28 and 29, respectively.

## B.    PAYPAL

The Internal Revenue Service still has payment card numbers where the card was issued in one of the offshore tax haven or financial privacy jurisdictions, but for which the cardholder has not been identified.  PAYPAL can help identify these persons. PAYPAL may also be able to provide new and additional payment cards and cardholders, as well as offshore bank accounts, of which the Internal Revenue Service is currently unaware.

This part of the declaration is divided into three subsections. The first describes the nature of PAYPAL's business. The second describes how the summoned information will help to identify those persons in the designated class. The third discusses the offshore jurisdictions which defines the "John Doe" class.

### 1. Nature of the Business

The following information is based on my research of PAYPAL. It includes information obtained through public documents such as Securities Exchange Commission filings, industry publications, Internet searches and published articles. Also, on April 19, 2005, I interviewed the leader of PAYPAL's Fraud Investigations Team.

PAYPAL's corporate headquarters are located at 2211 N. First St., San Jose, CA 95131. Founded in 1998, PAYPAL was acquired by eBay, Inc. in October 2002 and is now a wholly owned subsidiary of eBay. Most major components of the PayPal network reside at PAYPAL facilities in San Jose, California, at an eBay-owned data center in Denver, Colorado, at an Equinix data center in San Jose, California, and at the PayPal operations and customer support facility in Omaha, Nebraska.

PAYPAL enables any business or consumer with email to send and receive online payments securely, conveniently and cost-effectively. The PAYPAL network builds on the existing financial infrastructure of bank accounts and credit cards to create a global

payment system. PAYPAL's account-based system is available to users in 45 countries, including the United States. As of December 31, 2004, PAYPAL had approximately 64 million total accounts, comprising approximately 13 million business accounts and 51 million personal accounts.

A PAYPAL account may be opened by logging on to the PAYPAL Internet website and selecting the menu option "sign up now," or it may be opened in the process of conducting an Internet payment transaction with someone who is already a member. In either case, the applicant provides certain information essential to the processing of financial transactions, including identifying information for existing bank accounts and credit card accounts that the applicant expects to use as the source of funds for purchase transactions and as the destination of funds received in the PAYPAL account. For bank accounts, this information includes routing numbers needed by PAYPAL to identify and transact business with the applicant's bank and, for credit card accounts, the information includes the card number. This information may be verified by PAYPAL by making deposits or charges in nominal amounts to the bank accounts and credit cards, respectively, which the applicant is asked to confirm by e-mail.

To send or receive a payment, a user first must open a PAYPAL account. To make a payment at the PAYPAL website, a sender logs in to his account and enters the recipient's email address and the payment amount, and selects a funding source—credit

card, bank account or PAYPAL balance. To make a payment at a merchant's website through Web Accept, a sender selects an item for purchase, confirms the payment information and enters his email address and password to authorize the payment. If the purchaser is not already a PAYPAL member, the PAYPAL merchant's website contains a link the purchaser can follow to open an account before paying. However the payment is initiated, PAYPAL debits the money from the sender's PAYPAL balance, credit card or bank account and instantly credits it to the recipient's PAYPAL balance. In turn, the recipient can make payments to others or withdraw his funds at any time.

When a PAYPAL sender makes an email payment to a recipient who does not yet have a PAYPAL account, the recipient follows a link in the payment notification email to register with PAYPAL and gain access to the funds. Payment recipients may use their funds to make payments to others, leave the funds in their PAYPAL accounts and earn a money market rate of return, or withdraw the funds at any time by requesting a bank account transfer or a check delivered by mail or by using the PAYPAL ATM/debit card.

PAYPAL's account records include account information pages, a transaction log, and an account activity log. The account information page includes, among other information, the account holder's name, address, e-mail address, telephone number, and social security number, as well as information identifying credit cards and bank accounts

Declaration of Barbara Kallenberg

- 45 -

1373440.1

to which the PAYPAL account is linked. The transaction and activity logs contain information regarding use of the account. Once created, PAYPAL's records of account opening and activity are retained permanently.

### 2. Information to identify persons in class.

PAYPAL is in a position to identify the holders of numerous offshore payment cards whose numbers have been obtained by the Internal Revenue Service, but who have not yet been identified. The Internal Revenue Service obtained these card numbers from the earlier "John Doe" summonses detailed earlier in this declaration.

Both MasterCard and Visa complied with the "John Doe" summonses by producing files with electronic database records of specific card transactions charged to cards issued by banks in the identified jurisdictions. However, because MasterCard and VISA do not issue cards directly, but only process transactions for member banks licensed to issue MasterCard and VISA payment cards, the two companies were unable to directly identify cardholders as requested in the summonses. For many of the cards for which transactional data has been received, the MasterCard or VISA file contains a name associated with the payment card, but no other identifying information such as an address or social security number. The Internal Revenue Service has identified some cardholders from information obtained from the credit card companies and from merchants and third party processors, but there are still other payment cards for which

the cardholder has not yet been identified.

Based upon discussions with PAYPAL, I believe that PAYPAL has the ability to (1) compare with its records a list of payment card numbers for whom the account holder has not been identified by MasterCard, VISA, or merchants and third party processors, and (2) produce records of the accounts that PAYPAL processes. These records will identify all persons accessing the offshore payment cards through PAYPAL accounts and will therefore assist the Internal Revenue Service in identifying members of the ascertainable group or class under investigation.

In addition to identifying cardholders of those card numbers whose owners are not yet identified, PAYPAL's records will identify situations where U.S. taxpayers have the use of payment cards and bank accounts they have obtained under the name of an IBC, trust, or other entity in the offshore jurisdiction.

The "John Doe" summons is narrowly crafted in an attempt to retrieve from PAYPAL records leading to the identification of U.S. taxpayers. The Internal Revenue Service will provide PAYPAL with a list of payment card numbers that have not yet been identified. These payment card numbers will be those obtained from the previous "John Doe" summonses issued to MasterCard and VISA, but the holder of these cards have not yet been identified. The summons requires PAYPAL to provide records related to these payment card numbers.

1    The summons also seeks to identify persons of the "John Doe" class for whom the

2    IRS has not yet identified the payment card numbers. PAYPAL is required to provide

3    complete information with respect to all PAYPAL accounts that are linked on its records

4    to payment cards issued by or bank accounts maintained at banks in the subject

5    jurisdictions, not included on the list, where any person or entity associated with the card

6    account has or had an address or telephone number in the United States or a Social

7    Security number. Excluded from the scope of the summons are all cardholders

8    previously identified by the Internal Revenue Service as a result of the earlier "John

9    Doe" summonses.

11   This two part request is calculated to focus the PAYPAL summons on accounts

12   that are being used by U.S. taxpayers who are members of the John Doe class.

13       3.   <u>The Identified Countries</u>

14   The jurisdictions listed on the "John Doe" summons to PAYPAL are widely

15   known as places where, because of strict bank secrecy laws and devices such as

16   International Business Corporations, trusts and other subterfuges, persons can shield

17   their wealth from taxation in their home countries. These jurisdictions are all recognized

18   as principal offshore tax haven or financial privacy jurisdictions by industry analysts and

19   are actively marketed as such by promoters of offshore schemes. The jurisdictions were

20   selected on the reasonable belief that United States taxpayers have failed or may have

failed to comply with provisions of the internal revenue laws through the use of American Express, MasterCard, or VISA payment cards issued by, through, or on behalf of banks and other financial institutions in those jurisdictions.

## CONCLUSION

Based upon the foregoing, I have concluded that there is a reasonable basis for believing that the information sought in the "John Doe" summons issued to PAYPAL will identify United States taxpayers who may have diverted unreported income offshore or received unreported income from undisclosed offshore sources or have taken improper deductions or credits or have failed to withhold tax on certain payments made offshore and will enable the Internal Revenue Service to locate taxpayers who have failed to pay taxes owing under the Internal Revenue laws during the years ended December 31, 1999 through 2004.

I declare under penalty of perjury, pursuant to 28 U.S.C. Section 1746, that the foregoing is true and correct.

Executed this ___7___ day of October 2005.

BARBARA KALLENBERG
Revenue Agent
Internal Revenue Service

Declaration of Barbara Kallenberg

- 49 -

1373440.1